THE STATE OF OHIO, APPELLANT, *v.* JENKS ET AL., APPELLEES.

[Cite as *State v. Jenks* (1991), 61 Ohio St.3d 259.]

(No. 90–910—Submitted March 5, 1991—Decided July 31, 1991.)

*Stephanie Tubbs Jones,* prosecuting attorney, *George J. Sadd* and *Laurence R. Snyder,* for appellant.

*Gold, Rotatori, Schwartz & Gibbons Co., L.P.A.,* and *John S. Pyle,* for appellee Mary Jenks.

*Greene & Hennenberg* and *Michael C. Hennenberg,* for appellee Dale Madison.

*Randall M. Dana,* Public Defender, *Gregory L. Ayers* and *Kurt Gatterdam,* urging affirmance for *amicus curiae,* Ohio Public Defender Commission.

---

ALICE ROBIE RESNICK, J. We are confronted with two issues for our determination. First, the state asks this court to repudiate the rule regarding circumstantial evidence as set forth in *State v. Kulig, supra.* As a corollary, the state urges that we adopt the standard followed by the federal courts when reviewing the legal sufficiency of the evidence in a criminal case. The second issue presented in this case is whether the trial court committed reversible error in admitting certain evidence. A related question is whether the comments of the prosecutor during opening statement were likewise reversible error. We will consider these issues and the parties' arguments in that order.

I

The doctrine relied upon by the court of appeals is found in *Kulig, supra,* wherein the syllabus provides: "Circumstantial evidence relied upon to prove an essential element of a crime must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt." Since *Kulig,* Ohio courts have treated this tenet of law as an appellate standard of

review. This rule of law is also embodied in the standard instruction on the use of circumstantial evidence. See 4 Ohio Jury Instructions (1988) 42, Section 405.03(2). As such, the state challenges not only the standard of appellate review from a criminal conviction based on circumstantial evidence, but also the circumstantial evidence instruction. In support, the state cites cases from the United States Supreme Court, the federal circuit courts, and various state supreme courts. Because the issue is squarely presented to this court, we shall conduct an analysis as to the appropriate standard of appellate review of a criminal conviction and the propriety of the circumstantial evidence instruction.

A

*Prior Ohio Case Law*

It is a basic principle of law that the prosecution has the burden of proving a defendant's guilt beyond a reasonable doubt. The United States Supreme Court has held that the Due Process Clause of the Fourteenth Amendment to the United States Constitution protects a defendant in a criminal case against a conviction " * * * except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship* (1970), 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375. It is also an elementary principle of law that when reviewing a criminal conviction, " * * * [t]his court's examination of the record at trial is limited to a determination of whether there was evidence presented, 'which, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.' * * * Our review is thus confined to a determination of whether there was substantial evidence. * * * " (Citations omitted.) *State v. Eley* (1978), 56 Ohio St.2d 169, 172, 10 O.O.3d 340, 341, 383 N.E.2d 132, 134. We have more recently stated that " * * * '[t]his court may * * * examine the record with a view of determining whether the proper rules as to the weight of the evidence and degree of proof have been applied.' *State v. Martin* (1955), 164 Ohio St. 54, 57, 57 O.O. 84, 87, 128 N.E.2d 7, 12. * * * [I]t is not the function of this court to weigh the evidence developed at trial. However, we will examine the record in order to determine whether the evidence is of sufficient probative force to support a finding of guilt beyond a reasonable doubt. * * * " (Citations omitted.) *State v. Sage* (1987), 31 Ohio St.3d 173, 183, 31 OBR 375, 383–384, 510 N.E.2d 343, 351.

When the state relies on circumstantial evidence, in whole or in part, to prove either some or all of the elements of the crime with which a defendant is charged, a question arises as to the weight to be given such evidence. In

these cases, Ohio courts have employed the *Kulig* rule.[1] Although *Kulig* has been followed by subsequent case law, *State v. Sorgee* (1978), 54 Ohio St.2d 464, 8 O.O.3d 452, 377 N.E.2d 782; *State v. Goodin* (1978), 56 Ohio St.2d 438, 10 O.O.3d 533, 384 N.E.2d 290, we have limited the application of this rule concerning circumstantial evidence. " * * * [I]t is *only* when circumstantial evidence *alone* is relied upon to prove an essential element of the crime that it must be irreconcilable with any reasonable theory of innocence. * * * " (Emphasis added.) *State v. Italiano* (1985), 18 Ohio St.3d 38, 41, 18 OBR 75, 77, 479 N.E.2d 857, 860.

Therefore, this court has drawn a distinction between cases where the state uses wholly circumstantial evidence to prove an element of an offense, and cases where the state has submitted some direct evidence as to each element of a crime. It is only in the former scenario that this court has required that "[a]n appellate court will reverse a conviction based solely on circumstantial evidence where that evidence does not, as a matter of law, preclude all reasonable theories of innocence." *Sorgee, supra*, at syllabus. In *State v. Graven* (1978), 54 Ohio St.2d 114, 119, 8 O.O.3d 113, 116, 374 N.E.2d 1370, 1374, this court stated: " * * * [O]nce the jury has reached its decision, an appellate court, in a case where circumstantial evidence is relied upon, will reverse only where the evidence is insufficient as a matter of law to enable the jury to exclude a reasonable hypothesis of innocence."

The *Kulig* standard entails a two-step process. First, as is done in a case involving direct evidence of guilt, an appellate court must determine whether there is sufficient probative evidence to support the defendant's guilt beyond a reasonable doubt. See *State v. Sage, supra*. The second step, employed only when the state relies entirely on circumstantial evidence to prove an essential element of the offense, requires an appellate court to re-examine the circumstantial evidence to determine if the defendant's theory of innocence is reasonable or plausible. See *Sorgee, supra*. In other words, the appellate court must weigh two competing theories, one pointing to guilt and the other to innocence. In order for the conviction to stand, the appellate court must be satisfied not only that the circumstantial evidence supports a finding of defendant's guilt beyond a reasonable doubt, but, in addition, that the circum-

---

1. In doing so, we have departed from the maxim that appellate courts are not to reweigh the evidence. For example, in *Kulig* we stated that " * * * [a]lthough it is not ordinarily the function of this court to weigh evidence developed at trial, it may do so in order to determine whether that evidence is of sufficient probative force to support a finding of guilt beyond a reasonable doubt, which is required for conviction in a criminal case. * * * " *Id.* at 159, 66 O.O.2d at 352, 309 N.E.2d at 898.

stantial evidence is of sufficient force as to exclude every reasonable hypothesis of innocence put forward by the defense.[2]

## B
### Federal Case Law

The rule of law followed by the federal courts originated in *Holland v. United States* (1954), 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150. Therein, the United States Supreme Court was confronted with an attack on the trial court's failure to give a requested jury instruction similar to the standard instruction on circumstantial evidence in Ohio. The court stated as follows:

" * * * The petitioners assail the refusal of the trial judge to instruct that where the Government's evidence is circumstantial it must be such as to exclude every reasonable hypothesis other than that of guilt. There is some support for this type of instruction in the lower court decisions, * * * but the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect, *United States v. Austin–Bagley Corp.* [2 Cir.] 31 F.2d 229, 234, cert. denied, 279 U.S. 863 [49 S.Ct. 479, 73 L.Ed. 1002]; *United States v. Becker* [2 Cir.] 62 F.2d 1007, 1010; 1 Wigmore, Evidence (3d ed.), §§ 25–26.

"Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a

---

2. In *State v. Ebright* (1983), 11 Ohio App.3d 97, 11 OBR 150, 463 N.E.2d 400, the Franklin County Court of Appeals articulated this process as follows: "A determination of whether circumstantial evidence relied upon by the state is sufficient, as a matter of law, to exclude a reasonable theory of innocence, necessarily involves our weighing the evidence to a limited extent; we must ascertain whether reasonable minds could find only that the circumstantial evidence was consistent with guilt and that defendant's theory of innocence was therefore excluded. If the circumstantial evidence is as consistent with innocence as with guilt, then doubt must be resolved in favor of innocence. *State v. Kulig, supra* [37 Ohio St.2d] at 160 [66 O.O.2d at 354, 309 N.E.2d at 900]. Under those circumstances, where the circumstantial evidence is equally consistent with two reasonable but opposed theories, it is apparent that reasonable minds cannot find that the circumstantial evidence is consistent only with guilt and precludes a theory of innocence. On the other hand, if the circumstantial evidence is so supportive of the theory of guilt that the theory of innocence is not reasonable, then reasonable minds may conclude that the circumstantial evidence is consistent only with the theory of guilt and irreconcilable with any reasonable theory of innocence. * * * " *Id.,* 11 Ohio App.3d at 101, 11 OBR at 154, 463 N.E.2d at 404.

reasonable doubt, we can require no more." *Holland, supra,* 348 U.S. at 139–140, 75 S.Ct. at 137–138, 99 L.Ed. at 166–167.

*Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, reaffirmed the *Holland* approach. The court stated as follows: "Only under a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt could this petitioner's challenge be sustained. That theory the Court has rejected in the past. *Holland v. United States,* 348 U.S. 121, 140 [75 S.Ct. 127, 137, 99 L.Ed. 150, 167]. We decline to adopt it today. \* \* \* " *Id.* at 326, 99 S.Ct. at 2792–2793, 61 L.Ed.2d at 578.

Following the United States Supreme Court, the federal circuit courts are unanimous in their treatment of circumstantial evidence: "The Supreme Court did more than reject the particular instruction before it; it clearly stated that *no* instruction is to be given distinguishing the manner in which direct and circumstantial evidence are to be weighed. Since circumstantial and testimonial evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is to be required of the jury is that it weigh *all* of the evidence, direct or circumstantial, against the standard of reasonable doubt." (Emphasis *sic.*) *United States v. Nelson* (C.A.9, 1969), 419 F.2d 1237, 1241. See, also, *United States v. Rodriguez* (C.A.1, 1986), 808 F.2d 886, 890; *United States v. Fiore* (C.A.2, 1987), 821 F.2d 127, 128; *United States v. Hamilton* (C.A.3, 1972), 457 F.2d 95, 98; *United States v. Chappell* (C.A.4, 1965), 353 F.2d 83, 84; *United States v. Bell* (C.A.5, 1982), 678 F.2d 547, 549; *United States v. Conti* (C.A.6, 1964), 339 F.2d 10, 12–13; *United States v. Wigoda* (C.A.7, 1975), 521 F.2d 1221, 1225; *United States v. Carlson* (C.A.8, 1976), 547 F.2d 1346, 1360; *United States v. Merrick* (C.A.10, 1972), 464 F.2d 1087, 1092; *United States v. Davis* (C.A.D.C.1977), 562 F.2d 681, 689, fn. 10.

The reasoning used by several of the federal circuit courts is useful, and is thus worthy of comment. In *United States v. Obregon* (C.A.11, 1990), 893 F.2d 1307, 1311, the court stated: "In judging the sufficiency of evidence, we must view the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942). The jury's verdict must be sustained if any reasonable construction of the evidence allowed the jury to find the appellants guilty beyond a reasonable doubt. *United States v. Montes–Cardenas,* 746 F.2d 771, 778 (11th Cir.1984). The evidence may be sufficient even though it is not inconsistent with every reasonable hypothesis of innocence. The jury is free to choose among reasonable constructions of the evidence. \* \* \* The test is 'identical whether the evidence is direct or circumstantial, and no distinction is to be made between the weight given to either direct or circumstantial evidence.' \* \* \* " (Citations omitted.)

After a reading of *Obregon, supra,* we find three bases for the court's decision. First, the court pointed out the well-established rule that when reviewing the evidence from a criminal conviction, an appellate court must view the evidence in the light most favorable to the government. Second, the court noted that the jury is free to choose among reasonable constructions of the evidence presented in a criminal case. This reasoning was also relied upon by the court in *Rodriguez, supra.* Therein, the court quoted previous case law from the First Circuit, stating that " * * * 'if the evidence can be construed in various reasonable alternatives, the jury is entitled to freely choose from among them.' * * * " *Id.* at 890. See, also, *Bell, supra,* at 549. The third rationale found in *Obregon* can be traced back to the United States Supreme Court's language in *Holland, supra,* that "[c]ircumstantial evidence in this respect is intrinsically no different from testimonial evidence. * * * " *Id.,* 348 U.S. at 140, 75 S.Ct. at 137, 99 L.Ed. at 166.

We also note that the Sixth Circuit Court of Appeals has held that the federal standard delineated above is at odds with the *Kulig* rule requiring that circumstantial evidence be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt. In *York v. Tate* (C.A.6, 1988), 858 F.2d 322, the court held that " * * * the Ohio common law rule set forth in *Kulig* is not required by the federal Constitution and should not be applied by a federal court in deciding whether the petitioner is entitled to habeas relief." *York, supra,* at 330.

The *York* court reasoned that " * * * under the *Jackson* standard, the federal court is required to view the evidence 'in the light most favorable to the prosecution' and then determine whether *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt. By applying the *Kulig* rule, the district court turned the *Jackson* standard on its head. Rather than asking whether *any* reasonable juror could have found petitioner guilty, the district court considered whether any reasonable juror could have found the petitioner *not* guilty. * * * Such an analysis is totally at odds with the standard of review set forth by the Supreme Court in *Jackson.* We note that in *Jackson* the Supreme Court expressly rejected 'a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt * * *.' " (Emphasis *sic.*) *York, supra,* at 330.

## C

### Other State Court Case Law

State courts in other jurisdictions appear to be evenly divided on this issue regarding the use of circumstantial evidence. Our research has revealed that

some states follow the *Kulig* rule, while the remaining states have rejected the *Kulig* standard and instead embrace the federal view.[3]

### Jurisdictions Following the Kulig Standard

The jurisdictions that adhere to the *Kulig* rule employ slightly different phraseology, but nevertheless follow the rule. Mississippi law commands that where evidence of guilt is largely circumstantial, the state is required to prove the accused's guilt not only beyond a reasonable doubt, but also to the exclusion of every other reasonable hypothesis. *Fisher v. State* (Miss.1985), 481 So.2d 203. Mississippi has expressly recognized that an "[a]rguably stricter burden of proof [is] placed upon the state in circumstantial evidence cases. * * * *" *Id.* at 214. Illinois also adheres to the *Kulig* standard on circumstantial evidence: "[W]hen a conviction * * * rests upon circumstantial evidence the guilt of the defendant must be so thoroughly established as to exclude every other reasonable hypothesis * * *." *People v. Jones* (1985), 105 Ill.2d 342, 350, 86 Ill.Dec. 453, 456, 475 N.E.2d 832, 835. The primary explanation supporting both the circumstantial evidence charge and the con-comitant standard of appellate review is the theory that circumstantial evidence is less trustworthy than direct evidence. See Note, The Circumstantial Evidence Charge in Texas Criminal Cases: A Retrograde Doctrine (1977), 55 Tex.L.Rev. 1255, 1255–1257.

However, the states adhering to the *Kulig* rule have generally limited its operation by holding that the rule only applies in cases where the government's evidence as to an essential element is wholly circumstantial. See *People v. Ellis* (1989), 146 A.D.2d 709, 537 N.Y.S.2d 205; *Ebenezer v. State* (1989), 191 Ga.App. 901, 383 S.E.2d 373; *People v. Moore* (1989), 176 Mich. App. 555, 440 N.W.2d 67.

California law requires that to justify a conviction on circumstantial evidence, the facts and circumstances must not only be entirely consistent with

---

3. For states following the *Kulig* rule, see *Ex parte Williams* (Ala.1985), 468 So.2d 99; *Smith v. State* (1984), 282 Ark. 535, 669 S.W.2d 201; *Murdix v. State* (1982), 250 Ga. 272, 297 S.E.2d 265; *State v. Lilly* (La.1985), 468 So.2d 1154; *State v. Andrews* (Minn.1986), 388 N.W.2d 723; *State v. Easley* (Mo.1983), 662 S.W.2d 248; *Smith v. State* (Okla.App.1985), 695 P.2d 1360; *State v. Williams* (Tenn.1983), 657 S.W.2d 405; *State v. John* (Utah 1978), 586 P.2d 410; *State v. Wyss* (1985), 124 Wis.2d 681, 370 N.W.2d 745.

For states rejecting the *Kulig* rule, see *Des Jardins v. State* (Alaska 1976), 551 P.2d 181; *State v. Harvill* (1970), 106 Ariz. 386, 476 P.2d 841; *Henry v. State* (Del.1972), 298 A.2d 327; *State v. Bush* (1977), 58 Hawaii 340, 569 P.2d 349; *Gilmore v. State* (1981), 275 Ind. 134, 415 N.E.2d 70; *State v. Morton* (1982), 230 Kan. 525, 638 P.2d 928; *State v. Cowperthwaite* (Me.1976), 354 A.2d 173; *Finke v. State* (1983), 56 Md.App. 450, 468 A.2d 353; *People v. Johnson* (1985), 146 Mich.App. 429, 381 N.W.2d 740; *State v. Buchanan* (1981), 210 Neb. 20, 312 N.W.2d 684; *State v. Jones* (1981), 303 N.C. 500, 279 S.E.2d 835; *State v. Stokes* (1989), 299 S.C. 483, 386 S.E.2d 241.

the theory of guilt, but must be inconsistent with any other reasonable conclusion. *People v. Cole* (1985), 165 Cal.App.3d 41, 48, 211 Cal.Rptr. 242, 246. See, also, *People v. Bloyd* (1987), 43 Cal.3d 333, 351, 233 Cal.Rptr. 368, 377–378, 729 P.2d 802, 812.[4] However, a unanimous Supreme Court of California has severely restricted the application of the circumstantial evidence instruction: " * * * As numerous decisions of our court explain, * * * the circumstantial evidence rule on which defendant relies is 'primarily for the guidance of the trier of fact.' [Citations omitted.] 'The rule ... does no more than to instruct the jury that if a reasonable doubt is created in their minds for any reason they must acquit the defendant. But where the jury rejects the hypothesis pointing to innocence by its verdict, and there is evidence to support the implied finding of guilt as the more reasonable of the two hypotheses, this court is bound by the finding of the jury.' [Citation omitted.] Thus, even though the appellate court may itself believe that the circumstantial evidence might be reasonably reconciled with the defendant's innocence, this alone does not warrant interference with the determination of the trier of fact. * * * " *People v. Towler* (1982), 31 Cal.3d 105, 118, 181 Cal.Rptr. 391, 397–398, 641 P.2d 1253, 1259–1260. The *Towler* court went on to hold that "[w]hether the evidence presented at trial is direct or circumstantial, * * * the relevant inquiry on appeal remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. * * * " (Emphasis *sic.*) *Id.* at 118, 181 Cal.Rptr. at 398, 641 P.2d at 1260. Idaho also restricts application of the circumstantial evidence rule, much like California. *State v. Randles* (1990), 117 Idaho 344, 787 P.2d 1152.

### Jurisdictions Rejecting the Kulig Rule

Many states have rejected the *Kulig* standard, and instead adhere to the rule of law followed in the federal courts. We find that these state courts

---

4. California's standard jury instruction provides a good example of the general instruction utilized by these states regarding the sufficiency of circumstantial evidence:

    "However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion. " * * *

    "Also, if the circumstantial evidence [as to any particular count] is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to [his] [her] innocence, you must adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to [his] [her] guilt.

    "If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable." 1 California Jury Instructions: Criminal (5 Ed.1988) 23, Section 2.01.

have primarily relied on the Supreme Court's decision in *Holland v. United States, supra.* Since 1961, the Supreme Court of New Jersey has adhered to the approach taken in *Holland, supra. State v. Fiorello* (1961), 36 N.J. 80, 88, 174 A.2d 900, 904, fn. 1. In following *Holland,* the *Fiorello* court stated that prior case law supporting the circumstantial evidence rule had been criticized elsewhere, restrictively explained, and finally abandoned by New Jersey courts. *Id.* at 88, 174 A.2d at 904.

In *People v. Bennett* (1973), 183 Colo. 125, 131, 515 P.2d 466, 469, the Colorado Supreme Court stated: "The substantial evidence test which we have stated and now adopt is followed by a great majority of federal courts and differs from our present rule in one major respect. The substantial evidence test affords the same status to both direct and circumstantial evidence. *See* 2 C. Wright, Federal Practice and Procedure, § 467 at 257, 258. In recognizing this test, we now cast aside as outmoded and as confusing the requirement that the prosecution's evidence, when wholly circumstantial, must exclude every reasonable hypotheses [*sic*] other than that of guilt and no longer require such an instruction or such a test to be applied. The Supreme Court of the United States * * * eliminated the distinction relating to the weight to be afforded circumstantial evidence in *Holland v. United States* * * *."

The Supreme Court of Washington, when confronted with this issue, stated in *State v. Gosby* (1975), 85 Wash.2d 758, 539 P.2d 680, that " * * * [s]everal state supreme courts have recently reconsidered the issue and have opted to follow the federal rule. * * * " *Id.* at 765, 539 P.2d at 684. The court went on to conduct a thorough yet concise analysis of the issue that merits consideration:

"The underlying rationale for the requirement that a circumstantial-evidence instruction should be given * * * is predicated upon the assumption that circumstantial evidence is inherently suspicious and less trustworthy than is direct evidence. It is assumed that the multiple-hypothesis instruction is desirable in order to guard against an improper reliance and use by the jury of tenuous circumstantial evidence.

"However, the United States Supreme Court explicitly rejected the validity of this assumption in *Holland v. United States, supra* * * *. It is simply untenable to assume that circumstantial evidence is less reliable than is direct evidence. * * *

" * * * *

"In short, whether direct evidence or circumstantial evidence is more trustworthy and probative depends upon the particular facts of the case and no generalizations realistically can be made that one class of evidence is per se

more reliable than is the other class of evidence. Obviously, since circumstantial evidence is not per se less reliable than is direct evidence, there is no need to give the multiple-hypothesis instruction when circumstantial evidence is involved.

"In addition * * *, we think the instruction is essentially a convoluted one, the main effect of which is to confuse the jury, possibly implying that a higher standard than reasonable doubt is necessary to render a verdict of guilty when circumstantial evidence is employed. * * * " *Gosby, supra,* 85 Wash.2d at 765–767, 539 P.2d at 685. See, also, *State v. Roddy* (R.I.1979), 401 A.2d 23.

The Supreme Court of Vermont, when considering this issue, stated two criticisms of the *Kulig* standard regarding circumstantial evidence: " * * * First, as a device for judicial evaluation of the sufficiency of the evidence, the 'exclusion of every reasonable hypothesis of innocence' test is premised upon a now suspect distrust of circumstantial evidence. * * * The evidence in each case will differ. Yet, there are cases, such as the instant appeal, where circumstantial evidence is highly reliable. At times, direct evidence may be utterly insufficient. * * * The proper focus of judicial review should be the quality and strength of the evidence, whether direct or circumstantial.

"Second, * * * [r]ather than assisting jurors in applying the reasonable doubt standard, the traditional circumstantial evidence charge has been condemned for having the opposite effect. By directing [the] juror's attention to an additional, yet unnecessary, level of analysis, the circumstantial evidence charge serves only to confuse the real issue. * * * Jurors should never be deflected from the reasonable doubt standard as the primary focus of their inquiry. * * * " (Citations omitted.) *State v. Derouchie* (1981), 140 Vt. 437, 444–445, 440 A.2d 146, 149. The *Derouchie* court went on to conclude that " * * * [t]here is only one standard of proof for criminal convictions, whether the evidence is direct, circumstantial, or a combination of both." *Id.,* 140 Vt. at 445, 440 A.2d at 150.

D

We have carefully examined case law from other jurisdictions at both the state and federal levels, scrutinized the rationales relied upon by those courts, and fully considered the arguments of the parties. We now conclude that the time has come for Ohio to join those state and federal courts that have rejected the circumstantial evidence rule expressed in *Kulig, supra.* In doing so, we find persuasive the analysis and rationale employed by those very courts.

In *Holland, supra,* the Supreme Court determined that "[c]ircumstantial evidence in this respect is intrinsically no different from testimonial evidence. * * * " *Id.,* 348 U.S. at 140, 75 S.Ct. at 137, 99 L.Ed. at 166. The case law above supports and adopts this principle. See *People v. Bennett, supra,* and *State v. Gosby, supra.* This court has previously embraced the notion that there can be no bright-line distinction regarding the probative force of circumstantial and direct evidence. As our brethren Justice Wright points out in *State v. Lott* (1990), 51 Ohio St.3d 160, 167, 555 N.E.2d 293, 302, a capital case, " ' * * * [c]ircumstantial evidence * * * may also be more certain, satisfying and persuasive than direct evidence.' * * * " (Citations omitted.) Likewise, we have stated that " ' * * * proof of guilt may be made by circumstantial evidence as well as by real evidence and direct or testimonial evidence, or any combination of these three classes of evidence. All three classes have equal probative value, and circumstantial evidence has no less value than the others. 1A Wigmore, Evidence (Tillers Rev.1983) 944, Section 24 *et seq.*' * * * 'Circumstantial evidence is not less probative than direct evidence, and, in some instances, is even more reliable.' * * * " (Citations omitted.) *State v. Nicely* (1988), 39 Ohio St.3d 147, 151, 529 N.E.2d 1236, 1239.

Circumstantial evidence and direct evidence inherently possess the same probative value. In some instances certain facts can only be established by circumstantial evidence. Hence, we can discern no reason to continue the requirement that circumstantial evidence must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt. We agree with those courts that have held that an additional instruction on the sufficiency of circumstantial evidence invites confusion and is unwarranted. Since circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt. Nothing more should be required of a factfinder. See *State v. Derouchie, supra; State v. Roddy, supra;* and *State v. Gosby, supra.*

In every criminal case, the jury is asked to weigh all of the admissible evidence, both circumstantial and direct, to determine if the defendant is guilty beyond a reasonable doubt. Hence, there is but one standard of proof in a criminal case, and that is proof of guilt beyond a reasonable doubt.[5] This

---

5. Some courts have indicated that the circumstantial evidence rule arguably imposes a higher standard of proof on the government. See *Fisher v. State, supra,* and *State v. Gosby, supra.* Yet another formulation is that the circumstantial evidence rule " * * * is simply a method for evaluating whether the reasonable doubt standard has been met." *Derouchie, supra,* 140 Vt.

tenet of the criminal law remains true, whether the evidence against a defendant is circumstantial or direct. We therefore hold that where the state relies on circumstantial evidence to prove an element of the offense, and where the jury is properly instructed on the standards for reasonable doubt, an additional instruction on circumstantial evidence is not required. Once the jury is properly instructed as to the heavy burden the state bears under the "guilt beyond a reasonable doubt" standard, the jury is then free to choose between competing constructions of the evidence. See *Obregon, supra; Rodriguez, supra;* and *Bell, supra.* We hold that when the state relies on circumstantial evidence to prove an element of the offense charged, there is no requirement that the evidence must be irreconcilable with any reasonable theory of innocence in order to support a conviction. *State v. Kulig* (1974), 37 Ohio St.2d 157, 66 O.O.2d 351, 309 N.E.2d 897, is overruled to the extent it is inconsistent with our decision announced today. All other cases adhering to the *Kulig* rule are hereby disapproved to the extent they conflict with this opinion.

Proceeding to consider the proper standard of appellate review, where the evidence is either circumstantial or direct, we conclude that the relevant inquiry on appeal is whether any reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. In other words, an appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Eley, supra.* Thus, in reviewing both weight and sufficiency of the evidence, the same test is applied. The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of facts. *Jackson v. Virginia, supra.* It must be kept in mind by the appellate court that the jury heard all of the evidence and was instructed as to the law and as a result found the accused guilty beyond a reasonable doubt. Moreover, the relevant inquiry does not involve how the appellate court might interpret the evidence. Rather, the inquiry is, after viewing the evidence in the light most favorable to the prosecution, whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.,* 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573–574.

---

at 444, 440 A.2d at 149. If one accepts the theory that the circumstantial evidence rule imposes a higher burden on the prosecution, then that added burden is erroneous. The standard of proof in a criminal trial is guilt beyond a reasonable doubt, and no more. If one accepts the postulation that the circumstantial evidence rule is an alternative means for assessing whether the reasonable doubt standard has been met, then the additional jury instruction is redundant, and can only serve to confuse the jury.

## II

Jenks and Madison were charged with tampering with evidence, in violation of R.C. 2921.12(A)(1). The elements of this offense are threefold: (1) that a defendant knows that an official proceeding or investigation was in progress or was likely to be instituted; (2) that the defendant, with such knowledge, altered, destroyed, concealed or removed any document; (3) for the purpose of impairing the document's value or availability as evidence in any such proceeding or investigation. As to the first element, Jenks admitted that she knew one day after Risberg's death that an official investigation was expected, and anticipated that RTA would be involved. Madison admitted reading newspaper accounts of Risberg's death, including a story indicating that documents would be gathered for an ongoing investigation. In addition, Jenks and Madison have never denied that they destroyed documents. Therefore, in regard to the *first two elements*, it is clear that there was sufficient, probative evidence to support the jury's finding of guilt beyond a reasonable doubt.

The only issue seriously contested at trial was the third element, *i.e.,* whether Jenks and Madison destroyed the documents for the purpose of impairing their value or availability as evidence in the investigation. The court of appeals held that the state's evidence as to the element of purpose was insufficient as a matter of law to sustain a conviction. The appellate court ruled that " * * * [t]he state's evidence on the essential element of purpose was solely circumstantial * * * and such evidence was insufficient since it failed to preclude appellants' reasonable theory of innocence. Even though the evidence was such that an inference of guilt might reasonably have been drawn therefrom, the evidence was not sufficient to foreclose the drawing of appellants' equally plausible hypothesis of innocence."

We have concluded that this is not the appropriate standard of appellate review. Commensurate with the standard we announce today, we shall examine the record evidence to determine whether such evidence, if believed, would convince the average mind of the appellees' guilt beyond a reasonable doubt. In conducting this evaluation, we must view the evidence in the light most favorable to the prosecution, and ask whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson, supra.*

We note that " '[i]t is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts.' * * * Intent ' "can never be proved by the direct testimony of a third person and it need not be. It must be gathered from the surrounding facts

and circumstances." ' * * * " (Citations omitted.) *State v. Lott, supra,* 51 Ohio St.3d at 168, 555 N.E.2d at 302.

## A

The state's theory of the case was essentially that on July 7, 1987, Jenks and Madison destroyed documents that would have been evidence in the investigation surrounding Risberg's death by electrocution. Ostensibly, these documents would have shown that RTA officials had prior knowledge of a history of problems with the electricity at the bus shelters. The state also alleged that on July 16 and 17, 1987, Jenks and Madison again destroyed various documents relating to the investigation of Risberg's death. Apparently, the state contended that Jenks and Madison acted in response to a newspaper article claiming that RTA had knowledge of the problems with electricity which led to Risberg's death.

At trial, the state offered the testimony of fourteen witnesses and numerous documents to prove its case. The evidence established that on July 7, 1987, a group of summer interns reported for work in the Planning Department at RTA. One of the interns, Tobi Piunno, stated that Madison instructed her and other interns to clean out some files and throw some things away. Madison gave her a list of the documents that she and the other four interns were to throw away. She testified that while she or another intern held the list and read off numbers, the others would look for the file and then throw it into a trash container. When the trash containers became full, the interns would simply pile the documents on the floor. Piunno also testified that the interns threw out only the documents identified on the list, and no more. Piunno stated that she observed some of the documents that were discarded, and recalled seeing one large document pertaining to electrical work and bus shelters. Piunno then testified that she specifically asked Madison if she should throw it away, and that his response was to discard "everything on the list." Maria Colon, one of the other interns present that day, corroborated Piunno's testimony to the effect that she saw the list Madison gave the interns and that she also threw away documents. Lastly, William Jackson, an employee in the Planning Department, testified that he observed the interns discarding documents and cleaning files in the presence of both Jenks and Madison.

The state's witness providing most of the information regarding the destruction of documents on July 16 and 17 was Rose Moviel, an employee in the Planning Department. She testified that on July 15, Madison asked her to look through transmittal slips which showed the location of documents filed in the RTA archive facility. Moviel stated that Madison instructed that she

search the slips and pull anything to do with energy or shelters. Moviel located three boxes of documents and requested that they be brought from the archives to the Planning Department. These boxes of documents were delivered to Madison's office on July 16. On July 17, Moviel arrived at work and was asked by Madison to go through the boxes and pull out anything related to energy or the shelters. Moviel looked through the boxes and noted that they were half empty and contained no documents regarding energy or the shelters. Moviel also testified as to the events of July 7 regarding the interns' throwing away documents at the request of Jenks and Madison.

Donald Yuratovac was a seventeen-year employee with RTA. Yuratovac testified that he was head of what is now the Planning Department at RTA until the spring of 1986. During that time period, he supervised a small group of employees, including Madison and Steve Polzin, who had worked on a multitude of projects for the Planning Department. Yuratovac went on to explain the history of the passenger shelter program. Apparently, a committee was established to study what form the shelters would take, where they were to be located and what amenities would be in the shelters. However, the shelter program failed. At this point, RTA was approached by several entities who wished to take over the shelter program. According to Yuratovac, the responsibility was allocated between RTA and these private entities as follows: " * * * RTA would purchase the shelters, RTA would be responsible for the installation of the shelters. The advertising franchisee would be responsible for the purchase of the ad panels, the installation of the ad panels, the cleaning [of] the shelters and the selling of ad space." The shelter program was then undertaken, with the first shelters being installed in 1978 or 1979.

In 1983, Yuratovac became aware of some maintenance problems with the bus shelters. The original franchisee of the shelter advertising program went into default on its contract in that it was no longer selling advertising space or maintaining the shelters. By virtue of this default, the shelters and the ad panels became RTA property. Yuratovac related that because the shelters were in a general state of disrepair, the decision was made to formulate a request for proposals to seek any other advertising firms willing to take over the shelter program. Toward this goal, he directed Steve Polzin to conduct a survey of the passenger shelters in 1983. The survey's purpose was to inventory the shelter locations, determine their condition, identify those with damaged ad panels, and identify those shelters with damaged electrical lights. In completing this survey, Polzin generated numerous documents and memoranda. These documents identified problems with the electrical wiring going

to some of the shelters. Polzin's documents and files became a primary focus of the pending investigation, and thus were a focal point of this case as well.[6]

Yuratovac testified that he became aware of Risberg's death on June 30, 1987, the day after the electrocution. Shortly thereafter, recalling the electrical problems with the bus shelter program, Yuratovac directed Rose Moviel to secure the Polzin files involving the shelter program. Yuratovac believed that in light of the tragic death of Risberg, everything related to the shelters should be preserved. On the morning of July 6, 1987, Yuratovac asked Moviel in person if she had secured the Polzin files and saw the files in two boxes near her desk. Yuratovac returned the next morning to pick up the boxes containing the files, but could not find them. Instead, Yuratovac found the trash dumpsters filled with documents thrown away by the interns. Yuratovac testified that after the morning of July 6, he never saw the Polzin files relating to the electrical aspects of the shelter program again.

James J. Schiller was a member of the RTA Board of Trustees ("the board"). He first learned of Risberg's death by reading about it in the morning paper of June 30, 1987. The accident was discussed at a board meeting that same day. At a meeting of the RTA legal committee on July 7, an investigation was initiated and Schiller directed that all relevant documents pertaining to the electrification of the shelter be gathered. Schiller expected that these documents would be produced at a board meeting held July 21, but received nothing from the RTA legal department that day. Rather, Schiller testified that prior to the meeting, he learned that Jenks and Madison had destroyed some documents in the recent past. It was his intention to question

---

6. One of the Polzin documents that was admitted into evidence demonstrates the extent to which RTA had prior knowledge of the electrical difficulties associated with the bus shelters. The document is a memorandum dated September 23, *1983*, written by Polzin, and addressed to both Yuratovac and Taras G. Szmagala, who was then the Deputy General Manager at RTA. The Polzin memorandum explains an attached list of ad panel shelters which contains a description of the general condition of each shelter. This list was meant to aid in prioritizing the maintenance of the ad panel shelters, and attempted to grade the shelters according to their condition. Polzin made the following recommendations in the memorandum:

"I am particularly uncomfortable about trying to sell the ad panel contract, without substantial effort to verify and upgrade the condition of the ad panels. * * * Furthermore, the absence of grounds and external switches should be remedied prior to any contract. While, as I understand it, the probability of an accident (shock) is relatively remote given the fuses, the great deal of attention concerning this issue, and the clear non-compliance with electrical codes would leave us liable and susceptable [*sic*] to charges of negligence. Furthermore, the absence of external shut-off switches has resulted in the need to short out wires or cut off the conduit to remove the shock potential when a shelter is damaged or removed.* * * "

Attached to the Polzin memorandum were other memoranda he had uncovered dating as far back as 1980, which also described and detailed problems with the electrical systems of the ad panels at the bus shelters. One of the memos was likewise addressed to Szmagala.

these two individuals to determine if there had been any destruction of documents. Schiller testified that at this meeting of July 21, Jenks admitted to the board that she had destroyed some documents the week of July 6. Schiller also testified that Jenks stated to the board that Madison had assisted her. After Jenks was questioned, Madison was asked to come before the board. Schiller related that, with the members of the board present, Madison indicated that documents were destroyed during the week of July 6. Madison also informed the board that Jenks had directed him to destroy the documents. Lastly, Schiller testified that he made it clear to both Jenks and Madison that the documents he was interested in were those dealing with the electrification of the shelters.

Edward J. Opett was the Chief Assistant General Counsel to RTA. Opett testified that he was present during the board meeting of July 21, and that during this meeting both Jenks and Madison were brought before the board. Opett testified that Jenks related to the board that she had discarded some documents the week of July 6, and that Madison told the board that the documents were discarded after Risberg's electrocution. Opett also related that both Jenks and Madison informed the board that a number of interns had thrown the documents away in order to make future work space available. Opett also testified that he was never able to locate the Polzin files relating to the shelters.

Steve Polzin testified that he was an employee at RTA from January 1981 to November 1984, and that during this time period he worked in the Planning Department. In 1983, while apparently working on the aforementioned survey ordered by Yuratovac, Polzin generated numerous documents regarding the bus shelters and the problems associated with some of these shelters. The subjects of these documents varied from energy usage analyses and electrical bills to the general condition of the shelters. Polzin stated that he had extensive files regarding energy accounts and billings, and that he knew of electrical problems with the shelters as far back as 1980. Polzin testified that Madison was aware of the subject of his files. Finally, Polzin testified that documents and files turned over by RTA in response to a grand jury subpoena did not contain any of his files. Polzin stated that none of his files were among those turned over by the Planning Department.

Jenks and Madison both testified on their own behalf. Jenks admitted throwing away documents, including some of the Polzin materials, but stated that she and Madison did so on June 25, 1987—before Risberg's death. Jenks stated that the purpose of throwing out the documents was to make room for the interns, and that in retrospect she did not believe any of the discarded documents would have been useful in any investigation into Risberg's death.

Madison also testified that the Polzin documents were destroyed on June 25, 1987. He also explained that some of the documents he was throwing out were duplicates, and that the reason for cleaning out the files was to make room for the summer interns. Evidence, however, indicated that older documents were retained in the files and that many of them were also duplicates.

## B

Based on the foregoing testimony, we find that there was substantial evidence presented which, if believed, was sufficient to establish the guilt of Jenks and Madison beyond a reasonable doubt. In reviewing the evidence, we conclude that there was testimony that only the documents specified on a list given to the interns by Jenks and Madison were destroyed. Jenks and Madison, however, argued that documents were being destroyed to make room for summer interns. Moreover, witnesses testified that Jenks and Madison admitted that the Polzin files were destroyed the week of July 6, 1987. At trial, Jenks and Madison contended that although they had previously acknowledged to the RTA board that the Polzin files were discarded the week of July 6, these files were actually destroyed on June 25, 1987. Because there was conflicting evidence presented as to the element of intent, it was the function of the jury to weigh the evidence and assess the credibility of the witnesses in arriving at its verdict. Where reasonable minds can reach different conclusions upon conflicting evidence, determination as to what occurred is a question for the trier of fact. It is not the function of an appellate court to substitute its judgment for that of the factfinder. Rather, upon appellate review, the evidence must be viewed in the light most favorable to the prosecution. Testimony showing that only specified documents were being discarded could be found to establish intent. Thus, in applying the appropriate standard of appellate review, we conclude that a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia, supra.* As noted earlier, Jenks and Madison essentially admitted to two of the three elements of the offense of tampering with evidence. Both admitted knowledge of an official investigation, and both admitted to throwing away a number of documents and files. While the state's evidence that they committed these acts *for the purpose of impairing the availability or value* of these documents as evidence in the investigation was circumstantial, it was nevertheless sufficient to support the jury's finding of guilt. Even if we were to assume, as the appellate court did, that Jenks' and Madison's theory of innocence was reasonable, the jury was free to believe or disbelieve that theory. By finding Jenks and Madison guilty, it is clear that the jury rejected their theory of innocence. We find that there was substantial evidence going to each and every element of the

crime from which a jury could reasonably find Jenks and Madison guilty beyond a reasonable doubt.

## III

The second issue before us is whether the trial court committed reversible error in admitting certain evidence. A related question is whether the comments of the prosecuting attorney during opening statement regarding RTA corruption were likewise reversible error. As noted previously, the appellate court held that these comments were prejudicial and constituted reversible error. The underlying analysis for this holding was that the trial court had erred in allowing certain testimonial evidence to be admitted: " * * * While evidence was in fact introduced relevant to the prosecutor's comments, such evidence was irrelevant, incompetent and improperly admitted as the prosecutor should have known.* * * " The court of appeals cited only two other instances of improperly admitted evidence. The court went on to conclude that " * * * [t]he trial court was in error in allowing this and other prejudicial and irrelevant testimony appearing on the record that will not be recounted here.* * * "

During the opening statements, the prosecutor commented as follows:

"[Prosecutor]: * * * I think you will hear, at a later point, that the Bus Shelter Program was fraught with corruption—

"[Defense counsel]: Objection.

"[The Court]: Overruled. This is opening statement, not evidence.

"[Prosecutor]: —and that the electrocution was a result of those problems and that corruption; that the coverup, the case we're here on, is a direct result of the electrocution and a coverup of the corruption that led to the electrocution."

The court of appeals held that while " * * * much evidence of a coverup and corruption within RTA was, in fact, presented at * * * trial," this evidence was irrelevant and should not have been admitted. In other words, while the appellate court acknowledged that evidence of a coverup and/or corruption within RTA had been introduced as evidence, this evidence was itself inadmissible. We do not agree with this analysis.

Jenks' and Madison's attack as to the prosecutor's comments during opening statement is a challenge founded on prosecutorial misconduct. In *United States v. Obregon, supra,* the court was confronted with an assertion that comments by a prosecuting attorney in opening statements were unfairly prejudicial because the government had no intention of presenting evidence to support the comments. The *Obregon* court applied a two-part test, stating

that the first determination is " * * * whether the challenged statements were improper, and if so, whether they prejudicially affected the appellants' substantial rights. * * *" *Id.* at 1310. Moreover, "[a] prosecutor's statement will justify the reversal of a conviction if it undermined 'the fairness of the trial and contributed to a miscarriage of justice.' * * * In determining whether to reverse a conviction based on improper statements, we must review the claim against the entire record.* * * " *Id.* See, also, *State v. Maurer* (1984), 15 Ohio St.3d 239, 266, 15 OBR 379, 402, 473 N.E.2d 768, 793: "In general terms, the conduct of a prosecuting attorney during trial cannot be made a ground of error unless that conduct deprives the defendant of a fair trial. * * * "

We cannot say that the comment of the prosecutor in this case was improper. Jenks and Madison were charged with tampering with evidence. The allegation made by the state in charging them with this offense is that both Jenks and Madison destroyed documents in an attempt to conceal RTA's prior knowledge of the electrical problems which led to Risberg's death. We agree with the court of appeals that evidence of a coverup and/or corruption was admitted at trial. However, a blanket determination that such evidence was inadmissible does not *per se* render the comments during opening statements improper. After a thorough review of the record, we cannot say that Jenks and Madison were denied a fair trial. Nor do the statements of the prosecutor rise to the level of creating a miscarriage of justice.

We turn now to the issue concerning whether certain evidence was improperly admitted at trial. The appellate court, though alluding to numerous instances of improperly admitted evidence, specified only two: the testimony of Ruth Duale, Risberg's daughter, and the testimony of the county coroner. The court of appeals opined that the testimony of these two witnesses was irrelevant as there was little probative value to the testimony, and if there was any remote relevance it was outweighed by the prejudice to the defendants.

It must be remembered that " '[t]he trial court has broad discretion in the admission * * * of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere.' * * * " *State v. Maurer, supra,* 15 Ohio St.3d at 265, 15 OBR at 401, 473 N.E.2d at 791. Ruth Duale's testimony was that her attorneys sent a letter informing RTA that the firm had been retained. Duale also identified a number of newspaper articles reporting on her father's death and RTA's prior knowledge of the electrical problems associated with said death. Upon review, we conclude that the trial court did not abuse its discretion in allowing this testimony to be admitted as evidence. Duale's

testimony addresses the issue as to whether Jenks and Madison had knowledge of possible civil or criminal investigations. The fact that her attorneys contacted RTA relating to the representation of Duale tends to make RTA's knowledge of a civil suit more probable than not. Evid.R. 401. Moreover, Duale's identification of local newspaper articles also tends to show that it was public knowledge that this accident had taken place and an investigation was imminent. The testimony is therefore relevant. Likewise, we can discern no prejudice to the defendants that would outweigh the probative value of Duale's testimony. While we are aware of the fact that this was the victim's daughter, this fact alone does not amount to *unfair* prejudice. See *State v. Wright* (1990), 48 Ohio St.3d 5, 8, 548 N.E.2d 923, 926: " * * * Logically, all evidence presented by a prosecutor is prejudicial, but not all evidence unfairly prejudices a defendant. It is only the latter that Evid.R. 403 prohibits." We cannot say that the trial court abused its discretion in admitting Duale's testimony.

Dr. Robert Challener, as a representative of the county coroner's office, testified as to the cause of Risberg's death, and in a graphic nature described the condition of his body during the autopsy. This testimony was wholly irrelevant and should have been excluded. It is equally clear to us that the prosecuting attorney offered this evidence solely to inflame the passion and emotion of the jury. The condition of Risberg's body, as detailed by the coroner, had no bearing on the charges against Jenks and Madison. Yet, this testimony was admitted without objection by defense counsel. Therefore, the plain error rule is invoked. Crim.R. 52(B). " * * * 'Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus. Plain error does not exist unless, but for the error, the outcome at trial would have been different. *State v. Moreland* (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894, 899." *State v. Watson* (1991), 61 Ohio St.3d 1, 6, 572 N.E.2d 97, 103.

Given the length of this trial, the number of witnesses and the amount of documentary evidence admitted, we cannot say that the testimony of the county coroner rises to the level of plain error. We have already determined that there was other sufficient, probative evidence to support the convictions. Hence, it is unrealistic to suggest that but for the testimony of this one witness, the outcome at trial would have been different.

Lastly, Jenks and Madison argue that there were yet other instances of improperly admitted evidence which was unfairly prejudicial. We have reviewed the record and their arguments, and are convinced that *if* any error

was committed, it was harmless beyond a reasonable doubt. *State v. Williams* (1983), 6 Ohio St.3d 281, 6 OBR 345, 452 N.E.2d 1323; *Chapman v. California* (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.

## IV

### Conclusion

We have held that the circumstantial evidence charge is an unnecessary instruction that can only serve to confuse the jurors in their deliberations. The additional instruction on the sufficiency of circumstantial evidence is unwarranted since we no longer see any reason to adhere to the theory that circumstantial evidence is less reliable than direct evidence. We thus join a multitude of other courts, both federal and state, which no longer make this distinction. Circumstantial evidence is no more and no less probative than direct evidence. The circumstantial evidence instruction confuses the jury because it diverts their deliberations from deciding the case on the basis of the only standard of proof, which is guilt beyond a reasonable doubt. In the present case, the jury received the additional instruction on circumstantial evidence which we now find unnecessary. By their verdict of guilty, it is apparent that the jury rejected the appellees' theory of innocence.

Moreover, we have refined the standard of appellate review from a criminal conviction to reflect our rejection of the circumstantial evidence rule. An appellate court will no longer conduct a review of the evidence to determine if the state's theory of guilt is irreconcilable with any reasonable theory of innocence. If the jury is convinced that the prosecution has proven that the accused is guilty beyond a reasonable doubt, we can require no more. Likewise, where an appellate court determines there is sufficient probative evidence to support the jury's finding, it should affirm the conviction. However, nothing in our decision today changes the reviewing court's duty, when called upon, to examine the record evidence in the light most favorable to the prosecution to determine whether there was substantial, probative evidence to support a guilty verdict. More important, nothing in this opinion alters the state's heavy burden in a criminal case, which remains proof of guilt beyond a reasonable doubt.

For the foregoing reasons, we reverse the decision of the court of appeals and reinstate the convictions.

*Judgment reversed.*

Moyer, C.J., Sweeney, Holmes, Douglas, Wright and H. Brown, JJ., concur.